UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL  'O'

| Case No. | 2:17-cv-02538-CAS-SSx | Date | July 26, 2019 |
|----------|------------------------|------|----------------|
| Title | DAVID LILLIE v. MANTECH INT'L. CORP. ET AL. | | |

Present: The Honorable    CHRISTINA A. SNYDER

| Catherine Jeang | Not Present | N/A |
|------------------|-------------|-----|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:          Attorneys Present for Defendants:

Not Present                                             Not Present

**Proceedings:** (IN CHAMBERS) - DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW, OR IN THE ALTERNATIVE, FOR A NEW TRIAL (Dkt. [ 188 ], filed May 6, 2019)

PLAINTIFF'S MOTION FOR TWO TIMES BACK PAY AND INTEREST UNDER 31 U.S.C. § 3730(H) (Dkt. [ 186 ], filed on May 6, 2019)

PLAINTIFF'S MOTION FOR ATTORNEYS' FEES (Dkt. [ 187 ], filed on May 6, 2019)

## I.    INTRODUCTION

On April 3, 2017, plaintiff David Lillie filed this action against his former employer, defendant ManTech International Corporation ("ManTech"). Plaintiff claimed that defendant illegally retaliated against him by terminating his employment after plaintiff reported that he had received allegedly-unauthorized access to "classified/proprietary" information owned by a third-party government contractor. Specifically, plaintiff alleged claims for (1) retaliation in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h), (2) retaliation in violation of the Defense Contractor Whistleblower Protection Act ("DCWPA"), 10 U.S.C. § 2409, and (3) retaliation in violation of California Labor Code § 1102.5(b) ("Section 1102.5"). Dkt 1.[1]

_____

[1] Although plaintiff's complaint initially alleged additional claims for (1) breach of contract, and (2) breach of the implied covenant of good faith and fair dealing, the Court dismissed these claims on August 14, 2017, in response to defendant's motion to

A jury trial was held on February 19, 20, 21, 22, and 26, 2019.  Dkts. 142, 143, 146, 148, 167.  At the close of the plaintiff's case, defendant moved pursuant to Federal Rule of Civil Procedure 50 for judgment as a matter of law.  Tr. 02/21/19 P.M., 97:15–16.  It renewed its motion at the end of its own case.  Tr. 01/22/19 A.M., 59:14 – 17.  The Court reserved ruling until the jury returned its verdict, and on February 28, 2019, the jury returned a special verdict.  Dkt. 179 ("Verdict").  The jury found for plaintiff with respect to all of his claims and awarded plaintiff $1,505,561.00 in total damages.[2]

Currently before the Court is (1) defendant's renewed motion for judgment as a matter of law, or, in the alternative, motion for a new trial; (2) plaintiff's motion for two times back pay and interest, pursuant to 31 U.S.C. § 3730(h); and (3) plaintiff's motion for attorneys' fees.  The Court held a hearing on the motions on June 17, 2019.  Having carefully considered the parties' arguments and the entire record of this action, the Court finds and concludes as follows.

## II.   BACKGROUND

Plaintiff brought this retaliation case after he was furloughed by defendant in October and December 2014, and was ultimately terminated on February 6, 2015.  At trial, the parties presented the following evidence regarding the events at issue.

### A.   Plaintiff is Employed by Defendant

Defendant ManTech corporation is a consulting firm that provides technical, engineering, database, and scientific support services, as contracted.  Dkt. 188-10, Ex. 145 ("Stip. Fact") No. 2.  Plaintiff's employment with defendant began on February 5, 2007.  Plaintiff was hired as an at-will employee to work pursuant to a Reliability Engineering Support Services contract (the "RESS contract"), whereby defendant was to provide reliability engineering support services to the Jet Propulsion Laboratory ("JPL").  Stip. Fact. Nos. 1–2, 9; Dkt. 188-10, Ex. 61.  JPL is a federally-funded research and development center under the National Aeronautics and Space Administration

---

dismiss. Dkt. 23.

[2]    The jury's answers to the special verdict are listed in the background section.  See Section II(F).

("NASA"). Stip. Fact Nos. 1–2. The California Institute of Technology manages JPL, pursuant to a contract with NASA. Stip. Fact No. 1.

The RESS contract permitted JPL to unilaterally initiate, modify, and terminate the work which it contracted with defendant. Stip. Fact nos. 4–5. Between 2007 and 2014, plaintiff's employment was terminated three times, and he was rehired twice, by defendant due to fluctuations in funding and work availability. Stip. Fact. Nos. 10, 19; Tr. 2/20/19 P.M., 24:22–25:2; 29:13-30:4. Plaintiff was also briefly furloughed during his first period of employment. Tr. 2/20/19 A.M., 60:21–22. Plaintiff was first terminated on April 11, 2011. Stip. Fact No. 19; Tr. 2/20/19 P.M., 24:22–25:2. While he was rehired on January 25, 2012, on October 15, 2012, plaintiff's employment was terminated again. Stip. Fact No. 20; Tr. 2/20/19 A.M., 61:23–24; Tr. 2/20/19 P.M., 29:13–30:4.

On July 24, 2014, plaintiff was hired by defendant for the third time to work on the Mars InSight Mission, and it is this term of employment that is at issue in this case. Stip. Fact No. 22. This time, plaintiff was hired to work pursuant to the RESS II contract, which was the renewal of the initial RESS contract entered into by defendant and JPL; RESS II became effective on October 9, 2009. Tr. 2/20/2019 P.M., 28:12–29:07.

Plaintiff was subsequently furloughed on October 17, 2014. After returning from furlough on November 11, 2014, plaintiff was again furloughed on December 22, 2014 because JPL directed defendant to tell its employees to "stop work." Stip. Fact. No. 42. Ultimately, plaintiff's employment was terminated on February 6, 2015, when he declined to be recategorized as a part-time employee. Stip. Fact Nos. 48–49. Following his final termination, plaintiff was classified as "eligible for rehire." Tr. 2/21/19 P.M., 60:9-24; Tr. 2/22/19 A.M., 29:9-32:16. However, in April 2015, he was reclassified as "ineligible." Id.

The parties dispute why plaintiff was furloughed and ultimately terminated in Winter 2014–2015. Although defendant told plaintiff that he was furloughed, and ultimately terminated, due to a lack of funding, plaintiff contends that he was unlawfully terminated in retaliation for his disclosing that he was provided unauthorized access to certain proprietary files, which he contends were the property of Lockheed Martin. The parties presented the following evidence at trial:

## B.     Evidence Offered by Plaintiff Regarding His Furlough and Termination

At trial, plaintiff testified that his employment was unlawfully terminated because he reported a potential "government cover-up" of his access to proprietary information to his supervisor at ManTech, Erik Berg.

More specifically, plaintiff testified that after being rehired by defendant in July 2014 to perform contract work for JPL under the RESS II contract, plaintiff attended a "kick-off" meeting, held by JPL, on July 31, 2014. Tr. 2/19/19, 34:23–35:25. At the kick-off meeting, plaintiff was assigned work which included conducting a "worst case analysis" – an extreme-value analysis of the electronics used in a spacecraft to ensure that the spacecraft would not be damaged in any way. Id. at 39:16–41:16. Pursuant to the project, plaintiff was to write an interoffice memorandum ("IOM") along with JPL employees Chau Brown and Ernest Fierheller. Tr. 2/19/19, 39:16–24; Tr. 2/20/19 P.M., 41:2–14. Plaintiff testified that after attending the kick-off meeting, Linda Facto, a JPL employee, spoke to him and a handful of others about the importance of restricting contractors' access to proprietary information belonging to Lockheed Martin. Tr. 2/19/19, 43:22–25. Plaintiff testified that since he was a contractor working for JPL, he understood the comment to mean that he could not have access to proprietary documents from Lockheed Martin. Id. 44:6–14; 48:19–23. Although plaintiff previously had a non-disclosure agreement with Lockheed Martin, plaintiff testified that he believed that that agreement had expired on October 1, 2009, when the RESS I contract expired. Id. 32:18–22; 49:22–50:1; Tr. 2/20/20, A.M., 39:17–22; Tr. 2/20/20, P.M., 29:5–7.

On August 4, 2014, plaintiff contacted Brown, of JPL, to request MathCad files that were first produced by Lockheed Martin.[3] Tr. 2/19/19 50:11–51:1; 52:3–8. Plaintiff testified that he believed access to the files was necessary for him to complete the Worst Case analysis in a timely fashion. Id. at 50:11–51:1. In response, Brown contacted a Lockheed employee to request the files, id. at 58:21–23; 59:16–24, but the employee responded, in an email dated August 7, 2014, that "it [wouldn't] be possible to obtain the MathCad files you requested." Id. at 60:12–17. When Brown inquired whether the files were considered Lockheed Martin's proprietary data, the Lockheed employee did not respond to that question. Stip. Fact Nos. 23–25; Tr. 2/21/19 A.M., 42:2–16. Plaintiff

---

[3]     MathCad is a computer program that allows users to easily analyze and perform engineering calculations and to readily share the analysis with others. Tr. 2/19/19 51:2–15.

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:17-cv-02538-CAS-SSx | Date | July 26, 2019 |
| Title | DAVID LILLIE v. MANTECH INT'L. CORP. ET AL. | | |

emailed his supervisor, Erik Berg, with a status update that he could not access the MathCad files because the files were lost. Tr. 2/20/19 P.M., 63:9-64:6.

A few weeks later, however, JPL employee Fierheller found the MathCad files, and he uploaded them to a JPL server for plaintiff's use, without specifying where he found them. Tr. 2/19/19, 68:9–21. Plaintiff relied on the MathCad files to complete the Worst Case Scenario IOM. Id. 69:12–14.

Plaintiff testified that, on October 7, 2014, Brown asked plaintiff to delete references to the MathCad files in the IOM. Id. 74:14–21. Plaintiff testified that he told Brown "no" in response to her request. Id. at 75:18-23. Plaintiff contends that deleting references was not a normal procedure and that Brown had never made such a request before. Id. at 75:9–15. Later that same day, plaintiff sent an email to Brown inquiring whether JPL employee Facto had given approval for his access to the MathCad files. Id. at 83:7–12. Brown responded in an email:

> Don't know, but we are not flagging in the IOM who got and used the files (you vs Ernest vs me). And we are making all the Mathcad files proprietary so I do not think this will be an issue.

Id. at 84:19–85:2. Because Brown did not flag who received and used the files, plaintiff testified that he believed that Brown was attempting to conceal who used the files. Id. at 85:5–10. Brown did not, however, remove plaintiff's name indicating that he was an author of the IOM. Tr. 2/20/19 P.M., 45:1–46:4.

On October 7, 2014, following plaintiff's conversation with Brown, plaintiff contacted the JPL Ethics Department ("JPL Ethics"). Tr. 2/19/19 A.M., 77:3–78:18. Plaintiff testified that "after [Brown's] request for me to delete these references which is very unusual, I concluded that I didn't have authorization to use [MathCad] files, and this is why I reported to JPL Ethics a JPL employee had involved me with an apparent government cover-up." Id. 77:14–19. Plaintiff further testified that he "went to JPL Ethics and met Jane Anne Sanders there. Told her verbally that I have security clearance, and I cannot be part of a government cover-up." Id. 78:13-16. Lani De Benedicts, the manager of JPL Ethics, testified that JPL Ethics did not perform an investigation at that time, Tr. 2/20/19 P.M. at 12:12–14, and no one contacted ManTech, notifying it of plaintiff's report, id. at 12:19–24; 18:16–19. Plaintiff also forwarded Brown's email to JPL Ethics, but he did not receive a response. Tr. 2/19/19 A.M., 86:04–09.

The following day, on October 8, 2014, plaintiff sent an email to his supervisor at ManTech, Erik Berg, regarding his access to the MathCad files, titled "IOM 5131-14-194 manager needs to get involved" (the "Berg Email"). Stip. Fact No. 32; Tr. 2/19/19, 86:13–87:14. In the email, plaintiff stated:

> IOM 5131-14-194 is based, in part, on some Lockheed generated MathCad spreadsheets that may be Lockheed proprietary (most likely not). I've have [sic] heard that such Lockheed proprietary documents as provided by Lockheed in fulfillment to the InSight project are forbidden to contractors, (hearsay). However, the Mathcad spreadsheets that IOM references are from a prior mission, Juno, and NOT marked as "Lockheed proprietary." These were provided to me by Ernest Fierheller (see attached "Juno HEPS mac files.ped").
>
> A day or two after Ernest Frierheller provided these files, Linda Facto (the InSight Mission Assurance Manager) found these Juno files (or similar) in some unknown to me data storage. Linda Facto told Chau Brown that she had sent a request to Lockheed to determine whether or not contractors are allowed these files. Late that afternoon, Chau Brown told me [that] she wasn't getting the answers she needed from the mangers and to go ahead and use the files "covertly."
>
> Time has elapsed, work has been done, and still no word as to whether [or] not the access to contractor issues has [sic] been resolved, I sent an email to Chau Brown straight and to the point, (see attached "Re: My IOM Release Schedule.pdf"). As you can see from this attachment, Chau Brown's answer is unacceptable.
>
> This issue needs to be resolved before I can sign and release IOM 5131-14-194.

Dkt. 188-10, Ex. 4 ("Berg Email"); Tr. 2/19/19, 88:18–22; 89:25–90:3.

Berg responded to plaintiff's email the same day he received it by asking plaintiff to "come see me please." Plaintiff's Exhibit 16; Tr. 2/19/19, 92:23–93:1. Plaintiff testified that, upon receipt of Berg's response, he immediately walked down the hall to Berg's office, but Berg was not there. Id. at 93:5–9. Nonetheless, on October 9, 2014, plaintiff signed and released the IOM. Id. at 90:7–8. He testified that he signed the IOM because Berg had already signed it and because management asked him to sign it, as well. Id. 90:7–17. Thus, plaintiff testified that he signed the IOM under the belief that management got involved prior to requesting his signature. Id. 90:9–91:3. Plaintiff testified that he never otherwise discussed the MathCad files with Berg. Id. 93:5-14.

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:17-cv-02538-CAS-SSx | Date | July 26, 2019 |
|---|---|---|---|
| Title | DAVID LILLIE v. MANTECH INT'L. CORP. ET AL. | | |

On October 17, 2014, Berg notified plaintiff that he was being placed on intermittent furlough, due to lack of funding. Tr. 2/21/19 P.M., 38:13–20. Plaintiff returned to work full-time on November 11, 2014 when additional work became available. However, on December 19, 2014, Berg sent plaintiff an email notifying him of another furlough because defendant "received a stop work on the tasking you are currently working with JPL." Stip. Fact No. 39.[4] Plaintiff was then furloughed on December 22, 2014 and he received a letter from defendant indicating his furlough was due to a funding reduction. Tr. 2/20/19 P.M., 54:22–25.

One day later, on December 23, 2014, plaintiff sent an email to Congresswoman Judy Chu's office with the subject, "JPL coverup." Stip. Fact No. 43; Tr. 2/20/19 A.M., 24:2–25:7.[5] In his email, plaintiff stated:

> JPL's Chau Brown is covering up the fact that a contractor was given use of Lockheed proprietary documents by her knowing that it was in violation of the JPL/Lockheed contractual agreement. In the process, she has made me a co-conspirator without my consent.

---

[4] Plaintiff responded to Berg in an email stating, "Once again, I remind you that I am a full- time employee. You can offer me a furlough but I can say no. This is the case. No. If you don't have work for me, it's a Mantech problem not mine. I decline to accept anything other than full-time employment. I DO NOT agree to this change in my employment. I DO NOT agree to accept this furlough offer. The answer is no. Mantech likely should lay me off if there is not a full-time position for me. However if I am laid-off, Mantech is to cease using my professional credentials (i.e. resume) or good name to pursue Mantech's ambitions. This includes any proposal for present or future business. This is written notice, I DO NOT agree to this change in my employment, (furlough)." Stip. Fact No. 40 (emphasis in the original).

[5] Before contacting Congresswoman Chu's office, plaintiff first contacted Congressman Adam Schiff's office. However, a staffer for Congressman Schiff told plaintiff that he should contact a representative from plaintiff's own constituency. Tr. 2/20/19 22:15-23:14. In addition, when plaintiff first contacted Congresswoman Chu's office before the Christmas holidays, he was told to reach out again after the new year. Id. 23:11–14.

Tr. 2/20/19 A.M., 24:5–10. Plaintiff also included a table of events and dates as support. Dkt. 191-6 at 25. Congresswoman Chu's office responded on January 22, 2015, telling plaintiff that a caseworker had been assigned to his case, and that that person was inquiring with JPL. Tr. 2/20/19 A.M., 25:12–17.

On January 23, 2015, at the conclusion of plaintiff's 30-day period furlough, Berg notified plaintiff that, pursuant to ManTech policy, he was required to proceed with a "status change" to plaintiff's employment. Stip. Fact No. 48. Therefore, Berg explained that he would terminate plaintiff, unless plaintiff agreed to work on a part-time and on-call basis. Id.; Tr. 2/20/19 P.M., 56:6–9. Plaintiff refused the offer for part-time work, and his employment was terminated on February 6, 2015. Id. at 56:10–11. Plaintiff contends that there was enough additional work for him to continue employment as a full-time employee. For example, plaintiff testified that, on October 7, 2014, John Klohoker, who was the group supervisor of the product and circuit reliability group at JPL, told plaintiff that JPL had work to assign him for a Mars 2020 project. Tr. 2/19/19 80:6–81:7. In addition, plaintiff testified that after he was placed on furlough, he contacted JPL employees, who indicated that there was work available. See Tr. 2/20/19 A.M., 22:3–12. On January 16, 2015, JPL also advised Berg that it had work available on a separate project, and plaintiff testified that he would have been willing and able to complete that work. See Stip. Fact Nos. 45; Tr. 2/20/19 A.M., 26:17-30:3. That work was assigned to ManTech employees who had previously worked on the project. Stip. Fact Nos. 45–47.

Ultimately, it was concluded that a NDA that plaintiff had signed during an earlier period of employment permitted him to use the MathCad files. Tr. 2/20/19 A.M., 39:2–5. Plaintiff testified, however, that he disagreed with this conclusion because he believed that that NDA had expired on October 1, 2009. Id. 39:6–40:9.

### C.   Evidence Offered by Defendant Regarding Plaintiff's Furlough and Termination

By contrast, defendant presented evidence indicating that, similar to plaintiff's previous terminations, plaintiff was furloughed and ultimately terminated in Winter 2014–2015 due to a lack of funding.

In support of defendant's position, Berg testified that, upon receipt of plaintiff's email, wherein plaintiff inquired as to his use of the MathCad files, Berg called JPL employees to inquire whether plaintiff's access to the MathCad files was authorized. Tr.

| | CIVIL MINUTES – GENERAL | | **'O'** |
|---|---|---|---|
| Case No. | 2:17-cv-02538-CAS-SSx | Date | July 26, 2019 |
| Title | DAVID LILLIE v. MANTECH INT'L. CORP. ET AL. | | |

2/21/19 P.M., 34:2–24; 57:14–17. Berg explained that he spoke with Klohoker who stated that there was no concern about plaintiff accessing the files. Id. at 34:21–35:3; 59:2–8. After receiving confirmation that plaintiff's access was authorized, Berg testified that he met with plaintiff and informed him of the authorization. Id. at 34:21–36:18; 39:15–17; 57:14–58:11. Berg also stated that did not regard the email as a complaint of fraudulent or illegal activity or as fraud on the federal government. Id. at 59:2–16. Instead, he explained that inquiries such as plaintiff's were ordinary. Id. at 57:20-58:1.

Berg further testified that on October 17, 2014, defendant furloughed plaintiff and three other employees at the direction of JPL employee Klohoker, due to a lack of available work and funding. Tr. 2/21/19 P.M., 38:13–20; 58:12–18; 59:17–19. Shortly after October 17, 2014, plaintiff returned to work for defendant and was furloughed again in December 22, 2014. On January 21, 2015, Klohoker sent an email to Berg stating:

> I do not have full-time work for David Lillie. I am, and have been in the past, satisfied with the quality and quantity of David's work. Because of that, I would like for you to retain David's services in a consultation or an on-call status if that would be something that ManTech and David would be amenable to.

Plaintiff's Exhibit 18. Klohoker testified that no one asked him to send Berg that email. Tr. 2/21/19 P.M., 69:12–14.

Pursuant to Klohoker's email, on January 23, 2105, Berg offered plaintiff the opportunity to remain employed as a part-time, on-call employee. Id. 60:1–14. Plaintiff refused the offer, and his employment was terminated on February 6, 2015. Stip. Fact No. 49.

### D. Evidence on Plaintiff's Retention of Confidential Data after Plaintiff's Termination

Defendant categorized plaintiff as "eligible for rehire" when it terminated plaintiff in February 2015. However, defendant recategorized plaintiff as "ineligible" in April 2015, when JPL notified defendant that plaintiff had taken JPL's confidential data in violation of his confidentiality agreement with defendant. Tr. 2/21/19 P.M., 43:17–24; 60:15–24; 64:13–65:11; Tr. 2/22/19, 30:18–23.

Plaintiff testified that he returned the MathCad files at issue, as well as other data, his badge, and VPN access key to JPL Ethics on April 13, 2015. Tr. 2/20/19 A.M., 26:3–

16; 33:6–34:19. At that time, he had a meeting with JPL Ethics, which Congresswoman Chu's office organized. Id.

### E.     Evidence Pertaining to Plaintiff's Alleged Damages

At the time of plaintiff's employment termination, his annual salary was $113,276.80. Stip. Fact No. 22. Plaintiff testified that, since his termination, he has been unable to secure new employment. Tr. 2/20/19 A.M., 32:3–33:5. He also testified that his health had been "not so good" as he suffers from constant muscle pain due to insomnia and his financial struggles have caused stress in his marriage. Id. at 47:17–51:17. Plaintiff's witness Leslie Daugherty, a retained psychiatric social worker, testified that in August 2017 she diagnosed plaintiff with unspecified anxiety disorder. Tr. 2/21/19 P.M., 87:06–09. She also testified that she was unable to conclude the cause of the anxiety, namely whether it was caused by his work situation. Id. 92:02–12.

In December 2016, defendant lost the RESS contract, as JPL awarded it to another government contractor. Tr. 2/21/19 P.M., 61:5–8; Tr. 2/20/19 P.M., 67:7–68:1.

### F.     The Jury's Verdict

On the third day of deliberations, the jury returned a special verdict on February 28, 2019. Dkt. 179. The jury concluded that defendant did not place defendant on furlough in retaliation for plaintiff's disclosures, but the jury found that defendant terminated plaintiff in retaliation for his disclosures. The jury therefore found for plaintiff on all three claims and awarded him: $521,983.00 for past lost earnings, $339,828.00 for future lost earnings, $321,875.00 for past emotional distress, and $321,875.00 for future emotional distress. This totaled $1,505,561.00. Specifically, the jury found as follows:

1. False Claims Act

QUESTION NO. 1

Did Plaintiff David Lille prove by a preponderance of the evidence that he engaged in lawful acts in furtherance of an action under the False Claims Act or in an effort to stop a violation of the False Claims Act?

Yes  X  No ____

**CIVIL MINUTES – GENERAL**      **'O'**

| Case No. | 2:17-cv-02538-CAS-SSx | Date | July 26, 2019 |
|---|---|---|---|
| Title | DAVID LILLIE v. MANTECH INT'L. CORP. ET AL. | | |

QUESTION NO. 2

Did Plaintiff prove by a preponderance of the evidence that he had a good faith belief that ManTech was committing a fraud or falsehood against the government to obtain the payment of money?

Yes  X  No __

QUESTION NO. 3.

Did Plaintiff prove by a preponderance of the evidence that a reasonable employee in the same or similar circumstances would believe that ManTech was committing fraud or a falsehood against the government to obtain payment of money?

Yes  X  No ___

QUESTION NO. 4.A.

Did Plaintiff prove by a preponderance of the evidence that ManTech knew that Mr. Lillie was engaged in "protected activity' under the False Claims Act at the time it made the decision to place Mr. Lillie on furlough?

Yes  X  No ___

QUESTION NO. 4.B.

Did Plaintiff Lillie prove by a preponderance of the evidence that ManTech knew that Mr. Lillie was engaged in "protected activity" under the False Claims Act at the time it made the decision to terminate Mr. Lillie's employment?

Yes  X  No ___

QUESTION NO. 5.A.

Did Plaintiff prove by a preponderance of the evidence that ManTech made the decision to place Mr. Lillie on furlough because of that "protected activity" of which ManTech was aware?

Yes ___  No  X

**CIVIL MINUTES – GENERAL**      **'O'**

| Case No. | 2:17-cv-02538-CAS-SSx | Date | July 26, 2019 |
|----------|------------------------|------|----------------|
| Title | DAVID LILLIE v. MANTECH INT'L. CORP. ET AL. | | |

QUESTION NO. 5.B.

Did Plaintiff prove by a preponderance of the evidence that ManTech made the decision to terminate Mr. Lillie's employment because of that "protected activity" of which ManTech was aware?

Yes  X  No ___

     2.  DCWPA

QUESTION NO. 7.

Did Plaintiff prove by a preponderance of the evidence that he made a disclosure that involved information that Mr. Lillie reasonably believed was evidence of gross mismanagement of a NASA contract, a gross waste of NASA funds, an abuse of authority relating to a NASA contract, or a violation of law, rule, or regulation related to a NASA contract?

Yes  X  No ___

QUESTION NO. 8.

Did Plaintiff prove by a preponderance of the evidence that he made the disclosure to a manager or other employee of ManTech who had the responsibility to investigate, discover, or address misconduct?

Yes  X  No ___

QUESTION NO. 9.

Did Plaintiff prove by a preponderance of the evidence that ManTech knew of Mr. Lillie's protected disclosure?

Yes  X  No ___

QUESTION NO. 10.A.

Did Plaintiff prove by a preponderance of the evidence that his protected disclosure was a contributing factor in ManTech's decision to place Mr. Lillie on furlough?

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL　　　　'O'

| Case No. | 2:17-cv-02538-CAS-SSx | Date | July 26, 2019 |
|---|---|---|---|
| Title | DAVID LILLIE v. MANTECH INT'L. CORP. ET AL. | | |

Yes ___ No X

QUESTION NO. 10.B.

Did Plaintiff prove by a preponderance of the evidence that his protected disclosure was a contributing factor in ManTech's decision to terminate Mr. Lillie's employment?

Yes X No ___

QUESTION NO. 11.A.

Did ManTech prove by clear and convincing evidence that it would have furloughed Mr. Lillie even if he had not made a protected disclosure

Yes ___ No X

QUESTION NO. 11.B.

Did ManTech prove by clear and convincing evidence that it would have terminated Mr. Lillie's employment even if he had not made a protected disclosure?

Yes ___ No X

> 3. California Labor Code Section 1102.5

QUESTION NO. 13.

Did plaintiff prove by a preponderance of the evidence that ManTech knew that Mr. Lillie had disclosed to a government agency, a person with authority over Mr. Lillie, or an employee with authority to investigate, discover, or correct legal violations/noncompliance related to Mr. Lillie's refusal to participate in an unlawful cover-up of a contractor being provided unlawful access to third party data?

Yes X No ___

QUESTION NO. 14.

### CIVIL MINUTES – GENERAL             'O'

| Case No. | 2:17-cv-02538-CAS-SSx | Date | July 26, 2019 |
|----------|------------------------|------|----------------|
| Title | DAVID LILLIE v. MANTECH INT'L. CORP. ET AL. | | |

Did Plaintiff prove by a preponderance of the evidence that he had reasonable cause to believe that the access to third party data was a violation of a state/federal statute or a violation of or noncompliance with a local/state/federal rule or regulation?

Yes  X  No  ___

QUESTION NO. 15.A.

Did Plaintiff establish by a preponderance of the evidence that his disclosure of information was a contributing factor in ManTech's decision to place Plaintiff on a furlough?

Yes  ___  No  X

QUESTION NO. 15.B.

Did Plaintiff establish by a preponderance of the evidence that his disclosure of information was a contributing factor in ManTech's decision to terminate his employment?

Yes  X  No  ___

QUESTION NO. 16.A.

Would ManTech have decided to place Plaintiff on furlough anyway, for legitimate, independent reasons?

Yes  X  No  ___

QUESTION NO. 16.B.

Would ManTech have decided to terminate Plaintiff's employment anyway, for legitimate, independent reasons?

Yes  ___  No  X

QUESTION NO. 17.

## CIVIL MINUTES – GENERAL  'O'

| | | | |
|---|---|---|---|
| Case No. | 2:17-cv-02538-CAS-SSx | Date | July 26, 2019 |
| Title | DAVID LILLIE v. MANTECH INT'L. CORP. ET AL. | | |

Did Plaintiff establish by a preponderance of the evidence that ManTech's conduct was a substantial factor in causing harm to Plaintiff?

Yes  X  No ___

### 4.  Mitigation

QUESTION NO. 19.

Did Plaintiff exercise reasonable diligence to locate and maintain a suitable job after his employment with ManTech?

Yes  X  No ____

QUESTION NO. 21.

On what date do you find that Mr. Lillie copied ManTech's and its customer's files, which included data from other third parties?

[No Response]

QUESTION NO. 21.A.

Did Plaintiff copy ManTech's and its customer's files, which included data from other third parties, while he was employed by ManTech?

Yes  X  No ____

QUESTION NO. 21.B.

Did Plaintiff copy ManTech's and its customer's files, which included data from other third parties, after he was furloughed but before he was laid off by ManTech?

Yes ____  No  X

### 5.  After Acquired Evidence

QUESTION NO. 22.

| CIVIL MINUTES – GENERAL | | | 'O' |
|---|---|---|---|
| Case No. | 2:17-cv-02538-CAS-SSx | Date | July 26, 2019 |
| Title | DAVID LILLIE v. MANTECH INT'L. CORP. ET AL. | | |

Did Plaintiff retain copies of ManTech's and its customer's files, which included data from third parties, for an authorized business purpose of ManTech?

Yes  X  No  ___

QUESTION NO. 23.

On what date do you find that ManTech learned of Plaintiff David Lillie's misconduct?

[No Response]

QUESTION NO. 24

Would ManTech have re-employed Mr. Lillie upon learning of Mr. Lillie's copying its files for an unauthorized purpose?

[No Response]

QUESTION NO. 25

From the damages listed in Questions 7, 12, or 18, what amount of money do you attribute to damages that were incurred by Plaintiff David Lillie after ManTech learned that Mr. Lillie copied its files for an unauthorized purpose?

[No Response]

See Dkt. 180. The jury was unable to reach a decision as to whether punitive damages should be awarded. Id. Neither party has alleged that there were any errors in the jury instructions.

## III. DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

On May 6, 2019, defendant filed the instant renewed motion for judgment as a matter of law, or in the alternative, a new trial. Dkt. 188 ("JMOL Mot."). On May 23, 2019, plaintiff filed its opposition. Dkt. 191 ("JMOL Opp'n"). Plaintiff filed a reply on June 3, 2019 ("JMOL Reply").

**CIVIL MINUTES – GENERAL**      **'O'**

| Case No. | 2:17-cv-02538-CAS-SSx | Date | July 26, 2019 |
|---|---|---|---|
| Title | DAVID LILLIE v. MANTECH INT'L. CORP. ET AL. | | |

**A.**      **Legal Standard**

     **1.**      **Motion for Judgment as a Matter of Law**

Judgment as a matter of law is appropriate when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue . . . ." Fed. R. Civ. P. 50(a)(1); see also Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 139, 149 (2000). If the court does not grant a motion for judgment as a matter of law pursuant to Rule 50(a), a party may file a renewed motion for judgment as a matter of law after the trial. Fed. R. Civ. P. 50(b). It is well-settled that the standard for judgment as a matter of law is the same as the standard for summary judgment. Reeves, 530 U.S. at 150 (citing Anderson v. Liberty Lobby, Inc., 447 U.S. 242, 250–52 (1986)).

Judgment as a matter of law, like summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim upon which the moving party seeks judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); see also Fed. R. Civ. P. 56(c), (e). The nonmoving party must not simply rely on the pleadings and must do more than make "conclusory allegations [in] an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990); see also Celotex, 477 U.S. at 324. Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322; see also Abromson v. Am. Pac. Corp., 114 F.3d 898, 902 (9th Cir. 1997).

In light of the facts presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law. See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 631, n.3 (9th Cir. 1987). When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted); Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co., 121

F.3d 1332, 1335 (9th Cir. 1997). Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue. See Matsushita, 475 U.S. at 587.

In a motion for summary judgment, a court must review the record "taken as a whole." Matsushita, 475 U.S. at 587. Similarly, in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record. Reeves, 530 U.S. at 150. In so doing, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. Id. (citations omitted); see also Berry, 39 F.3d at 1057. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 447 U.S. at 255. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. Reeves, 530 U.S. at 151 (citing 9B C. Wright & A. Miller, Federal Practice and Procedure § 2529 (3d ed. 2019)). In other words, the court should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Reeves, 530 U.S. at 151 (citing Wright & Miller, supra, § 2529).

## 2.      Motion for a New Trial

A court may grant a new trial if the jury's verdict is against the clear weight of the evidence. Landes Const. Co., Inc. v. Royal Bank of Can., 833 F.2d 1365, 1371 (9th Cir. 1987). In considering a Fed. R. Civ. P. 59 motion, the court may "weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." Id. at 1371–72 (citing 11 C. Wright & A. Miller, Federal Practice and Procedure § 2806, at 48–49 (1973) ("If, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial.")). However, the court should only grant a new trial if, without substituting its judgment for that of the jury, the court is firmly convinced that the jury made a mistake. Landes Constr. Co., 833 F.2d at 1372.

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:17-cv-02538-CAS-SSx | Date | July 26, 2019 |
|----------|------------------------|------|----------------|
| Title | DAVID LILLIE v. MANTECH INT'L. CORP. ET AL. | | |

**B.     Discussion**

**1.     Plaintiff's Claim Under the False Claims Act**

The False Claims Act was enacted to combat "widespread fraud by government contractors who were submitting inflated invoices and shipping faulty goods to the government." United States ex rel. Hopper v. Anton, 91 F.3d 1261, 1265–66 (9th Cir. 1996). The False Claims Act creates liability for any person who, *inter alia*, "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval [to the government]; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. 3729(a)(1). A claim under the FCA includes four elements: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." U.S. ex rel. Hendow v. Univ. of Phoenix, 461 F.3d 1166, 1174 (9th Cir. 2006). Importantly, to bring a FCA claim, "[i]t is not enough to allege regulatory violations; rather, the false claim or statement must be the 'sine qua non of receipt of state funding.'" United States ex rel. Campie v. Gilead Scis., Inc., 862 F.3d 890, 899 (9th Cir. 2017), cert. denied sub nom. Gilead Scis., Inc. v. U.S. ex rel. Campie, 139 S. Ct. 783 (2019) (internal citations omitted).

Section 3730(h) of the FCA is intended to "protect 'whistleblowers,' those who come forward with evidence their employer is defrauding the government, from retaliation by their employer." Hopper, 91 F.3d at 1269. Specifically, the statute imposes liability on an employer that "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against [an employee] in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under" the FCA's other provisions. 31 U.S.C.A § 3730(h) (West). To this effect, there are three elements to a claim brought under FCA's anti-retaliation provision: "(1) that he or she engaged in activity protected under the statute; (2) that the employer knew the plaintiff engaged in protected activity; and (3) that the employer discriminated against the plaintiff because he or she engaged in protected activity." Moore v. California Inst. of Tech. Jet Propulsion Lab., 275 F.3d 838, 845 (9th Cir. 2002).

The whistleblower protections of the FCA are specific and limited: "Section 3730(h) only protects employees who have acted 'in furtherance of an action' under the FCA." Hopper, 91 F.3d at 1270. However, "to state a FCA retaliation claim, a plaintiff must show that he or she suspected that the defendant submitted a false claim—not that

the defendant actually submitted one." <u>Mendiondo v. Centinela Hosp. Med. Ctr.</u>, 521 F.3d 1097, 1103 (9th Cir. 2008). In addition, "[s]pecific awareness of the FCA is not required, but the plaintiff must be investigating matters which are calculated, or reasonably could lead, to a viable FCA action." <u>Moore</u>, 275 F.3d at 845 (quoting <u>Hopper</u>, 91 F.3d at 1269).

Defendant argues that plaintiff "was only inquiring (at most) about a possible breach of a [Non Disclosure Agreement], and he did not report any concerns about fraud on the government." JMOL Reply at 2. Defendant therefore contends that plaintiff lacked a subjective belief that he was engaged in protected activity, as contemplated by the FCA, and that "no reasonable employee could have objectively believed that [defendant] was committing fraud against the government." <u>Id</u>. Defendant also argues that "the trial record is devoid of any evidence that could support a finding that [defendant] was on notice that [plaintiff] was investigating or reporting potential fraud on the government"—which further brings this case outside the scope of the FCA. <u>Id</u>. at 5. In response, plaintiff argues that he presented sufficient evidence at trial for a reasonable jury to find in plaintiff's favor on his FCA claim. JMOL Opp'n at 11.

### a.     Whether Plaintiff engaged in Protected Activity as Contemplated by the FCA

"An employee engages in a protected activity by 'investigating matters which are calculated or reasonably could lead to a viable [False Claims Act] action.'" <u>Campie</u>, 862 F.3d at 907 (quoting <u>Moore</u>, 275 F.3d at 845). More specifically, "an employee engages in protected activity where (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government." <u>Id</u>. The test for assessing whether disclosures constitute protected activity under the FCA thus includes subjective and objective components. <u>Moore</u>, 275 F.3d at 845, n.1.

### i.     The Subjective Prong

At trial, plaintiff testified that he believed that JPL employee Chau Brown sought to conceal the fact that plaintiff had potentially accessed proprietary data—Lockheed Martin's MathCad files—while completing the Worst Case Scenario IOM for JPL. Plaintiff further presented evidence that he told his supervisor, Berg, that he questioned whether he was authorized to access those files. He also presented evidence that he contacted the JPL Ethics Department, as well as Congresswoman Chu's office, to report

the event.[6]  See, e.g., Tr. 02/20/19 A.M., 24:5–10 ("JPL's Chau Brown is covering up the fact that a contractor was given use of Lockheed proprietary documents by her knowing that it was in violation of the JPL/Lockheed contractual agreement.").

At no time during plaintiff's testimony did he use the word "fraud," nor did he make allegations which indicated or suggested that fraud occurred.  He did not discuss any government benefits that ManTech received nor any false claims or certifications that may have been submitted to the government for payment.  Plaintiff's emails that were admitted into evidence similarly raised no concerns about false claims or the fraudulent receipt of government benefits.[7]  In addition, plaintiff testified that he reported Brown's alleged misconduct because he feared for his security clearance and because he believed it was required by his job.  Tr. 2/19/19, 78:13–16  (plaintiff explaining that he "went to JPL Ethics and met Jane Anne Sanders there.  Told her verbally that I have a security clearance, and I cannot be part of a government cover-up . . ."); Id. at 88:7–10 (plaintiff explaining that he contacted Berg because he "believe[d] that it was required by ManTech policy that I inform Erik Berg of –of these issues"); see also Tr. 2/20/19 A.M., 41:1–2 ("I was just fulfilling my requirements, so that Chau Brown's getting into trouble was okay with me.").

Importantly, reports of compliance concerns are not protected by the FCA.  "[T]he absence of a connection between [a regulatory] violation and a false claim" is a "fatal defect" in an FCA retaliation case.  Josey v. Impulse Dynamics (USA) Inc., 371 F. Supp. 3d 603, 609 (D. Ariz. 2019) (citing Campie, 862 F.3d at 899, 904).  "Thus, an employee cannot make out a case if her actions [were] designed only to generate compliance with the law, but can make out a case if her actions investigate[d] fraud by a contractor."  Hanson v. Raytheon Co., No. SA CV 13-0896-DOC, 2014 WL 185911, at *2 (C.D. Cal.

---

[6]    Although the parties appear to agree that Lillie's email to Berg was the only instance in which plaintiff notified defendant of his concerns, see Section III(B)(b), the Court still considers all of plaintiff's reports as evidence of plaintiff's subjective belief about whether his employer was committing fraud against the government.

[7]    Although in closing argument, counsel for plaintiff argued that "Mr. Lillie believed in good faith that ManTech was committing fraud or falsity to obtain payment from federal government.  Mr. Lillie's employed by ManTech, he's performing work for JPL and JPL pays Mr. Lillie from those NASA funds," tr. 2/26/2019, 44:4–10, argument is not evidence.

Jan. 14, 2014) (finding that plaintiff alleged that she engaged in protected activity because the alleged misconduct "could lead to an overbid resulting in a fraudulent overcharge to the federal government"); see also Hopper, 91 F.3d at 1269 (concluding that "the record quite clearly show[s] [that the plaintiff] was merely attempting to get the School District to comply with Federal and State regulations [which] was not whistleblowing as envisioned in the paradigm qui tam FCA action"); Boyd v. Accuray, Inc., 873 F. Supp. 2d 1156, 1164 (N.D. Cal. 2012), aff'd, 593 F. App'x 647 (9th Cir. 2015) ("Here the record quite clearly shows that Plaintiff was merely attempting to get Accuray to comply with FDA's 'traceability' regulatory requirement and was concerned about patient safety, not fraud against the U.S. government."); Sicilia v. Boeing Co., 775 F. Supp. 2d 1243, 1249 (W.D. Wash. 2011) (concluding, on a motion for summary judgment, that the plaintiff's suggestions that the defendant may be out of compliance "did not concern fraud and are not protected under the FCA").

While plaintiff never expressly stated—in testimony or in his emails— that he believed that defendant may have engaged in fraud, and while reports of mere non-compliance do not constitute protected disclosures, plaintiff repeatedly reported Brown's behavior—first to JPL Ethics, then to Berg, and finally to Congresswoman Chu's office. He also twice characterized the incident as an alleged "government cover-up." Viewing the evidence in the light most favorable to plaintiff, the Court thus finds that a reasonable jury could conclude that plaintiff subjectively believed in good faith that defendant was "possibly committing fraud against the government." Campie, 862 F.3d at 907. The evidence on this issue is legally sufficient.

## ii.     The Objective Prong

"To demonstrate that his belief was objectively reasonable, [plaintiff] must establish that a reasonable employee in the same or similar circumstances might believe that [defendant] (1) knowingly (2) made a false statement or engaged in a fraudulent course of conduct (3) that was material (4) to the government's decision to pay out money or forfeit moneys due." Neighorn v. Quest Health Care, 870 F. Supp. 2d 1069, 1094–95 (D. Or. 2012) (citing Hendow, 461 F.3d at 1174).

Plaintiff appears to contend that because defendant is paid by JPL with federal funds, plaintiff's alleged belief that he was investigating an FCA claim was objectively reasonable. JMOL Opp'n at 13. However, the case law is clear that a defendant's mere receipt of federal funds does not transform any potential regulatory or contractual

violation into an FCA claim. There must be a foreseeable "nexus" between the alleged misconduct and the eligibility of funds. See Hopper at 1277 (holding that a teacher's report indicating that a school district, which received federal funds, was out of compliance with the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., did not support an FCA retaliation claim because there was no showing that compliance was "the cause of the Government's providing the benefit"); see also United States v. Pfizer Inc., No. 16-CV-7142, 2019 WL 1200753, at *9 (N.D. Ill. Mar. 14, 2019) (while defendant received federal funding, plaintiff's disclosures about alleged violations of FDA regulations did not constitute protected activity where plaintiff's complaints did not relate to government claims or payment).

Here, the record does not support a reasonable conclusion that the alleged misconduct—JPL's alleged contractual breach—could have been tied to defendant's receipt of a government benefit. There was no evidence presented at trial that would permit a reasonable jury to find that any allegedly unauthorized access granted by JPL to Lillie to the MathCad files, or "cover-up" of that access could reasonably have been believed by Lillie to have operated to defraud the government, nor that had such access been disclosed, in the IOM or otherwise, any payment to ManTech by the government would not have been made. Indeed, there was no evidence which suggested that plaintiff's use of the MathCad files was in any way material to the government's payment of funds—nor that an employee in plaintiff's position would believe that it was. Neighorn, 870 F. Supp. 2d at 1094–95; Universal Health Services, Inc. v United States ex rel. Escobar, 136 S. Ct. 1989, 1996, 2003 (2016) (holding that "[a] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act" and the standard for materiality is "demanding").

At trial, only defendant presented evidence regarding the process by which defendant billed JPL, and thus the government. Berg testified that defendant billed JPL hourly for the time its employees spent on JPL's projects. Tr. 2/21/19 P.M., 56:7–57:13. Berg explained that defendant's employees submitted timecards, which he reviewed for accuracy. Id. at 56:21–57:7. Plaintiff offered no evidence which connected *defendant's* receipt of government benefits to *JPL's* compliance with its contract obligations. There was no evidence that defendant's compensation was conditioned on JPL's compliance with an NDA, nor that there was a certification requirement in place. There was similarly no evidence that such provisions are customary in the industry—which might substantiate plaintiff's concern. Quite simply, plaintiff therefore never presented a viable theory

which explained why a reasonable employee would believe that his access to the MathCad files could have perpetrated a fraud on the government, as contemplated by the FCA.

On a renewed motion for judgment as a matter of law, the Court must treat the evidence in the light most favorable to the non-moving party. However, if the moving party meets its initial burden, the opposing party must then set forth specific facts and evidence in order to defeat the motion. <u>Anderson</u>, 477 U.S. at 250. At trial, plaintiff presented no evidence on the nexus between his access to the MathCad files and defendant's receipt of payment by the government. Accordingly, in light of the evidence presented by defendant, which was not rebutted by plaintiff, the court finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for [plaintiff] on [this] issue . . . ." Fed. R. Civ. P. 50(a)(1); <u>see, e.g.</u>, <u>Sicilia</u>, 775 F. Supp. 2d at 1250 (plaintiff failed to prove the objective reasonableness of his alleged FCA investigation, premised on an implied false certification theory, because plaintiff failed to produce evidence supporting his contention that defendant was required to certify its compliance with all federal laws and regulations when it entered into contracts with the government); <u>Neighorn</u>, 870 F. Supp. 2d at 1094 (finding plaintiff's belief that defendant was perpetuating fraud against the government "objectively unreasonable" where plaintiff failed to demonstrate that the alleged non-compliance was related to any payment).

### b. Whether Defendant had notice of Plaintiff's Protected Activity

Even if, *arguendo*, plaintiff had reasonably believed that he was investigating matters that could give rise to an FCA violation, the Court finds that the evidence does not legally support a finding that defendant had notice of plaintiff's allegedly protected activity. Under the FCA, "[a]n employee is entitled to whistle blower protection only if 'the employer is aware that the employee is investigating fraud.'" <u>Moore</u>, 275 F.3d at 846–47. Courts have found that the notice requirement is not met where a plaintiff simply indicates, to the defendant, that he is reporting an error or some form of non-compliance. "[W]hen an employee voices complaints but does not refer to any allegations of fraudulent conduct against the government, the employer lacks the requisite knowledge to make out a FCA retaliation claim." <u>U.S. ex rel. Lockyer v. Hawaii Pac. Health</u>, 490 F. Supp. 2d 1062, 1085 (D. Haw. 2007), aff'd in part sub nom. <u>U.S. ex rel. Lockyer v. Hawaii Pac. Health Grp. Plan for Employees of Hawaii Pac. Health</u>, 343 F. App'x 279 (9th Cir. 2009); <u>see also</u> <u>Hopper</u>, 91 F.3d at 1270) ("Even if [defendant] were

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:17-cv-02538-CAS-SSx | Date | July 26, 2019 |
| Title | DAVID LILLIE v. MANTECH INT'L. CORP. ET AL. | | |

intimately familiar with [plaintiff's] complaints, [plaintiff] never gave any indication she was investigating the School District for defrauding the federal government. [Defendant] may have engaged in retaliation for Hopper's activities, but the record does not show any connection to the FCA."); United States ex rel. Cady v. EMD Serono, Inc., No. 07-CV-08382-ABC(PLAx), 2010 WL 11579018, at *4 (C.D. Cal. May 28, 2010) (same).

In this case, the record does not support a conclusion that defendant had notice that plaintiff was engaged in "protected activity," as contemplated by the FCA. As an initial matter, the parties agree that only plaintiff's email to Berg could have notified defendant of plaintiff's alleged protected activity. Defendant learned of plaintiff's reports to JPL Ethics and Congresswoman Chu's office only after plaintiff's termination. Mot. at 20; reply at 5, n.3; see also Dkt. 50 No. 77.[8] This inquiry thus focuses on plaintiff's email to Berg, and the Court finds that it would allow, at most, a reasonable jury to find that plaintiff may have been given access by JPL employees to Lockheed proprietary information in breach of a confidentiality agreement, and that JPL employees told him to use the information "covertly" and cover up his use of that information in the material to be sent to JPL.

The parties dispute what occurred after plaintiff emailed Berg—whether or not they met. However, the content of plaintiff's email—which was admitted into evidence—is undisputed. In that email, plaintiff notifies Berg that the IOM he created was "based, in part, on some Lockheed generated MathCad spreadsheets that may be Lockheed proprietary," but "most likely not." He explains that the files were not marked as proprietary. Then, plaintiff explains that he had had heard—through "hearsay"—that his access, as a contractor, may have been restricted, but he could not get "word as to whether [or] not the access to contractor issues has been resolved." Plaintiff also told

---

[8]    In its opposition brief, plaintiff does not address this issue, but only mentions his email to Berg as evidence of notice to defendant. Opp'n at 12 ("ManTech knew that plaintiff was engaging in protected activity because plaintiff sent the October 8, 2014 'manager needs to get involved email' to Berg."). At oral argument, plaintiff also stated that it was only plaintiff's email to Berg that would have provided notice to defendant. Tr. 6/17/19, 7:21–23 ("That is when in October 8, 2014, that's when ManTech is put on notice that Mr. Lillie in a three-paragraph email that JPL is asking Mr. Lillie to commit fraud.")

| CIVIL MINUTES – GENERAL | | | 'O' |
|---|---|---|---|
| Case No. | 2:17-cv-02538-CAS-SSx | Date | July 26, 2019 |
| Title | DAVID LILLIE v. MANTECH INT'L. CORP. ET AL. | | |

Berg that "[t]his issue needs to be resolved before I can sign and release IOM 5131-14-194."

What is also undisputed is that the very next day, plaintiff signed the IOM. Plaintiff testified that he signed the IOM because Berg had already signed the report, and because management requested plaintiff's signature, which indicated to plaintiff that his concerns had been addressed. See Tr. 2/19/19, 90:7–17; see also Tr. 6/17/19, 8:5–6 ("When Mr. Lillie saw that Mr. Berg signed the IOM, he thought ManTech had got involved and addressed the situation."). Accordingly, as of October 9, 2014, plaintiff believed that the issue he had raised about whether he had been given unauthorized access to the MathCad files had been resolved, and plaintiff's signature would have signaled to defendant that plaintiff believed the issue had been resolved to plaintiff's satisfaction.[9] The record demonstrates that plaintiff never raised additional concerns about his access to the MathCad files or any cover-up of that access until after his furlough in December, and these concerns were not brought to defendant's attention until after plaintiff's termination.

Thus, in light of the possible misconduct that plaintiff reported, and the manner in which he reported it, plaintiff's statements could not be said to have constructively notified Berg that plaintiff suspected that he was reporting fraud. Moreover, even if plaintiff's email had raised concerns about plaintiff's suspicions of fraud, plaintiff's signing the IOM only one day later would have reasonably dispelled any belief by ManTech that plaintiff still had any concerns. Testimony by defendant's witnesses also failed to support a conclusion that defendant was actually "on notice" that plaintiff had engaged in protected activity. Berg, who admitted to taking part in the decision to furlough and ultimately terminate plaintiff, see Tr. 2/21/19 P.M., 41:7–8, testified that he did not interpret plaintiff's email as notice that plaintiff was reporting potential fraud, id.

---

[9]    At oral argument, counsel for plaintiff argued that plaintiff's signing the IOM would not "erase his reporting the violation" because he only signed the IOM after his supervisor signed it. Tr. 6/17/29, 16:12–14. Notwithstanding this fact, because plaintiff stated that he never further discussed his email or the IOM with Berg or anyone else, defendant would reasonably believe that plaintiff's concerns had not been allayed. See id. at 93:12–14. Plaintiff's signature would simply signal to defendant that his concerns had been assuaged.

| CIVIL MINUTES – GENERAL | | | 'O' |
|---|---|---|---|
| Case No. | 2:17-cv-02538-CAS-SSx | Date | July 26, 2019 |
| Title | DAVID LILLIE v. MANTECH INT'L. CORP. ET AL. | | |

at 59:2–16.[10]  Instead, Berg stated that he received emails about access to proprietary information roughly annually, and that Berg responded by confirming with JPL that "the contract we had in place covers this specific scenario."  Id. at 57:17–19.[11]  Berg further testified that his "interpretation of Mr. Lillie's email to me was he said it was hearsay and it seemed very doubtful [that he had improperly access the MathCad filed] even in the way that he was asking the question."  Id. at 58:05–07.

Accordingly, in light of his alleged access to propriety information that plaintiff questioned, and the manner in which he reported it, plaintiff may have put defendant on notice that he believed JPL may have breached its contractual obligations owed to Lockheed and sought to conceal the fact of plaintiff's access.  However, even if plaintiff had engaged in protected activity, the Court finds, as a matter of law, no evidence in the record demonstrates that defendant knew or should have known that plaintiff was engaged in protected activity before defendant decided to terminate plaintiff.  Mendiondo, 521 F.3d at 1103.  Accordingly, no reasonable jury could conclude, on the record before it, that defendant possessed the requisite knowledge for plaintiff to establish a FCA retaliation claim.

### c.  Whether Defendant Discriminated Against the Plaintiff Because He or She Engaged in Protected Activity

The Court need not assess the evidence pertaining to the third element of plaintiff's FCA retaliation claim, because the Court has found that a reasonable jury would not have a legally-sufficient evidentiary basis to find for plaintiff on the first and second elements.  Hopper, 91 F.3d at 1269 (granting judgment as a matter of law in favor of defendant after reaching only the first and second elements of a claim, brought under 31 U.S.C. § 3730(h)).  Accordingly, while the jury found that plaintiff's disclosures were the cause of plaintiff's termination, because plaintiff did not engage in protected activity, as

---

[10]  "Q. Did you feel Mr. Lillie was complaining about a fraud on NASA? A. No. Q. A fraud of any kind on the federal government? A. No. Q. Did you think that he was reporting any type of illegal conduct? A. No."  Tr. 2/21/2019 P.M., 59:2–16.

[11]  Berg also testified that he met with plaintiff after receiving plaintiff's email, and notified plaintiff that his use of the MathCad files had been authorized by Klohoker.  However, this is a disputed fact, and on this motion for judgment as a matter of law, the Court draws all inferences in favor of plaintiff, the non-moving party.

contemplated by the FCA, and because defendant did not have notice that plaintiff had raised any concerns about suspected fraud on the government, plaintiff's "protected activity" could not have been the cause of his termination.

\*     \*     \*     \*     \*

In sum, the Court finds that plaintiff failed to produce evidence demonstrating that he engaged in protected activity, as contemplated by the FCA, and he failed to produce sufficient evidence that defendant knew that he had engaged in protected activity. Quite simply, plaintiff provided no evidence that he was reasonably "investigating matters which are calculated or reasonably could lead to a viable FCA action." Although plaintiff notified Berg that a JPL employee may have wrongfully permitted plaintiff to access Lockheed Martin's MathCad files, there was no reasonable and foreseeable nexus presented—or even inferred—between plaintiff's access to the MathCad files, and defendant's eligibility for government funds or benefits. The Court thus **GRANTS** judgment as a matter of law in favor of defendant, as to plaintiff's FCA claim.

## 2.    Plaintiff's Claim Under the DCWPA

Similar to the FCA, the DCWPA provides that an employee of government contractors and grantees "may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing . . . information that the employee reasonably believes" demonstrates "gross mismanagement," "a gross waste of . . . funds," "an abuse of authority," "a violation of law, rule, or regulation" or "a substantial and specific danger to public health or safety," in relation to Department of Defense or NASA contracts or grants. 10 U.S.C.A. § 2409(a)(1) (West). The elements of a DCWPA retaliation claim mirror those under the FCA: "in order to establish a prima facie case of unlawful retaliation, a whistleblower plaintiff must establish that: (1) he engaged in 'protected activity'; (2) his employer knew or was reasonably on notice that he was engaged in protected activity; and (3) his employer took adverse action against him as a result of his protected activity." United States ex rel. Cody v. Mantech Int'l Corp., 207 F. Supp. 3d 610, 620–21 (E.D. Va. 2016).

However, while the elements of the DCWPA mirror those of the FCA, courts have found that what constitutes "protected activity" under the DCWPA is broader than under the FCA because the DCWPA protects disclosures of five types of misconduct. Id. at 623 (quoting 10 U.S.C. § 2409(a)(l)). In addition, while a plaintiff's protected activity must have been the "but for" cause of an employer's adverse employment decision in

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:17-cv-02538-CAS-SSx | Date | July 26, 2019 |
| Title | DAVID LILLIE v. MANTECH INT'L. CORP. ET AL. | | |

order for a defendant to incur liability under the FCA, under the DCWPA, an employee's protected activity need only have been a "contributing factor." See id. at 624; see also Cejka v. Vectrus Sys. Corp., 292 F. Supp. 3d 1175, 1192 (D. Colo. 2018).

Defendant argues that plaintiff did not engage in protected activity because his reports of alleged misconduct were not cognizable "protected disclosures" under the DCWPA. JMOL Mot. at 24. Defendant adds that plaintiff failed to present evidence that defendant had actual or constructive notice of plaintiff's alleged protected activity, and that plaintiff would have been terminated regardless of any protected activity. Id. at 26–27.

### a. Whether Plaintiff Engaged in Protected Activity as Contemplated by the DCWPA

Plaintiff engaged in protected activity if he disclosed, to "[a] management official or other employee of the contractor or subcontractor who has the responsibility to investigate, discover, or address misconduct," what he "reasonably believed" to be "gross mismanagement," "a gross waste of . . . funds," "an abuse of authority," "a violation of law, rule, or regulation," or "a substantial and specific danger to public health or safety" in relation to Department of Defense or NASA contracts or grants. 10 U.S.C.A. § 2409(a)(1) (West). "[E]xpressions of concern that do not raise the reasonable prospect of" one of these enumerated circumstances "do not constitute 'protected activity,'" as contemplated by the DCWPA. Cody, 207 F. Supp. 3d at 622 (citing Zahodnick v. Int'l Bus. Mach. Corp., 135 F.3d 911, 914 (4th Cir. 1997)).

### i. Whether plaintiff disclosed what he "reasonably believed" to be "a gross waste of . . . funds" or "a substantial and specific danger to public health or safety"

As a preliminary matter, plaintiff did not disclose—to Berg, to JPL Ethics, or to Congresswoman Chu's Office—a "gross waste of . . . funds" or "a substantial and specific danger to public health or safety."[12] In his email to Berg, plaintiff reported that

---

[12]  For the purposes of this first element, which assesses whether plaintiff engaged in protected activity, the Court considers all three of plaintiff's disclosures. As is relevant to the second prong, however, and as discussed above, the record is clear that defendant

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:17-cv-02538-CAS-SSx | Date | July 26, 2019 |
|----------|------------------------|------|----------------|
| Title | DAVID LILLIE v. MANTECH INT'L. CORP. ET AL. | | |

he may have received unauthorized access to Lockheed Martin's MathCad files. Plaintiff's Exhibit 16; Tr. 2/19/19, 88:18–22; 89:25–90:3. To JPL Ethics, plaintiff stated that "a JPL employee [Chau Brown] had involved [him] with an apparent government cover-up" by disguising his access to Lockheed's MathCad files. Tr. 2/19/19, 77:14–19. To Congresswoman Chu, he reported that a JPL employee was "covering up" the fact that he received proprietary information, "in violation of the JPL/Lockheed contractual agreement." See Tr. 2/20/19 A.M., 24:5–10. None of these disclosures reference funds, public health, or public safety.

### ii.    Whether plaintiff disclosed what he "reasonably believed" to be "an abuse of authority"

Section 2409 does not define an "abuse of authority," and the case law addressing the statute is limited. However, the federal Whistleblower Protection Enhancement Act, 5 U.S.C. § 2302(b)(8) (the "WPA"), similarly protects federal employees from retaliatory adverse employment action where they disclose information pertaining to the same categories of misconduct enumerated in § 2409(a). Compare 10 U.S.C.A § 2049(a) with 5 U.S.C.A. § 2302(b)(8). Defendant contends that the Court can look to Section 2302 as persuasive authority on Section on 2049. JMOL Mot. at 25. Plaintiff does not disagree, and the Court finds the reasoning sound.

Courts and agencies interpreting the WPA define an "abuse of authority" as "an arbitrary or capricious exercise of power by a federal official or employee that adversely affects the rights of any person or results in personal gain or advantage to himself or preferred other persons." Pasley v. Dep't of Treasury, No. DC-1221-07-0810-W-1, 2008 WL 2315747 (M.S.P.B. June 6, 2008). As an example, the Merit Systems Protection Board found that an employee had disclosed an abuse of authority where he reported that his agency had "manipulated the creation and promotion process . . . so that only certain employees were eligible for selection." Berkowitz v. Dep't of Treasury, No. NY-1221-02-0065-W-1, 2003 WL 22299183 (M.S.P.B. Sept. 30, 2003).

Here, where plaintiff reported Brown's alleged violation of a contract between JPL and Lockheed, plaintiff failed to present evidence indicating that he actually, let alone reasonably, believed that Brown's conduct had "adversely affect[ed] the rights of any person or results in personal gain or advantage to himself or preferred other persons."

---

only knew of plaintiff's email to Berg—and not plaintiff's reports to JPL Ethics and to Congresswoman Chu's office. See Section III(B)(1)(b).

<u>Pasley</u>, 2008 WL 2315747.  Plaintiff did not report that Brown had exercised her "power"—in her official capacity—to the benefit or detriment of others.  Accordingly, no reasonable jury could conclude that plaintiff reasonably believed that he was reporting an "abuse of authority," as contemplated by the DCWPA.

### iii.    Whether plaintiff disclosed what he "reasonably believed" to be "gross mismanagement"

The DCWPA similarly does not define "gross mismanagement," and case law interpreting the statute has not reached this issue.  However, <u>Black's Law Dictionary</u> defines "gross" as "[b]eyond all reasonable measure; flagrant" or "[c]onspicuous by reason of size or other attention-getting qualities."  <i>Gross</i>, <u>Black's Law Dictionary</u> (11th ed. 2019) (West).  In addition, courts have defined "gross mismanagement" in the context of Section 2302: "Gross mismanagement means more than de minimis wrongdoing or negligence; it means a management action or inaction that creates a substantial risk of significant adverse impact on the agency's ability to accomplish its mission."  <u>Swanson v. Gen. Servs. Admin.</u>, No. DA-1221-08-0182-W-1, 2008 WL 5104244 (M.S.P.B. Dec. 4, 2008).  In its recent amendment to Section 2302, Congress approved this definition.  <u>See</u> S. REP. 112-155, 8, 2012 U.S.C.C.A.N. 589, 596 (explaining that "the Merit Systems Protection Board used an appropriate definition of 'gross mismanagement' in <u>Swanson</u>").  Importantly, too, courts have established an objective test for determining whether an employee "reasonably believed" that his disclosure indicated "gross mismanagement."  As explained by the Federal Circuit, and adopted by the Ninth Circuit, "the proper test [is] whether a disinterested observer who had knowledge of the essential facts known to and readily ascertainable by the employee could reasonably conclude that the disclosure evidenced gross mismanagement."  <u>White v. Dep't of Air Force</u>, 391 F.3d 1377, 1380 (Fed. Cir. 2004); <u>Coons v. Sec'y of U.S. Dep't of Treasury</u>, 383 F.3d 879, 890 (9th Cir. 2004) (adopting the test established by the Federal Circuit); S. REP. 112-155, 6-7, 2012 U.S.C.C.A.N. 589, 594-95 (approving the Federal Circuit's objective reasonable-belief test, and incorporating it into the statute).  Employing this test, courts have concluded that "[m]ere differences of opinion between an employee and his agency superiors as to the proper approach to a particular problem or the most appropriate course of action do not rise to the level of gross mismanagement."  <u>White</u>, 391 F.3d at 1381.

Plaintiff reported an isolated incident, in which a government employee might have attempted to conceal plaintiff's use of Lockheed Martin's MathCad files.  Plaintiff

nowhere provided evidence that he believed that the alleged misconduct was pervasive, systemic, or commonplace, nor that Brown's alleged misconduct constituted anything "more than de minimis wrongdoing or negligence." Swanson, 2008 WL 5104244. The Court thus finds no evidence to support a conclusion that plaintiff reasonably believed that the alleged misconduct "create[d] a substantial risk of significant adverse impact on the agency's ability to accomplish its mission." Swanson, No. DA-1221-08-0182-W-1, 2008 WL 5104244; see Wen Chiann Yeh v. Merit Sys. Prot. Bd., 527 F. App'x 896, 900 (Fed. Cir. 2013) ("Without more information regarding the pervasiveness of the purported [] misconduct, any significant adverse impact on the agency's mission cannot be assessed."). In addition, plaintiff's email to Berg primarily evidenced that plaintiff disagreed with Brown about "the proper approach to a particular problem," namely whether the IOM produced by plaintiff should reference the MathCad files that plaintiff used. Such alleged misconduct "do[es] not rise to the level of gross mismanagement," and thus plaintiff's disclosure about the incident does not, as a matter of law, constitute a protected disclosure under the DCWPA. White, 391 F.3d at 1381.

> iv. **Whether plaintiff disclosed what he "reasonably believed" to be "a violation of law, rule, or regulation"**

The Court also finds that plaintiff did not produce evidence that he reasonably believed that he was reporting "a violation of law, rule, or regulation" in relation to a NASA contract or grant. In the context of the WPA, the Supreme Court has ruled that a "law" specifically refers to statutes. Dep't of Homeland Sec. v. MacLean, 135 S. Ct. 913, 921, 190 L. Ed. 2d 771 (2015); Flynn v. United States Sec. & Exch. Comm'n, 877 F.3d 200, 205 (4th Cir. 2017) (discussing the Supreme Court's holding). "Rule" and "regulation" have not been defined, but courts interpret them as rules and regulations promulgated by agencies. See Flynn v. United States Sec. & Exch. Comm'n, 877 F.3d 200, 205 (4th Cir. 2017) (noting that the Administrative Procedure Act defines "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency"); see also Kraushaar v. Dep't of Agric., No. SF-1221-00-0088-W-1, 2000 WL 1867870 (M.S.P.B. Dec. 12, 2000) (finding that an employee's disclosure was protected where he reported a violation of an agency's regulation). Normally, "protection under the WPA requires that an employee identify a specific law, rule, or regulation that was violated." Langer v. Department of the Treasury, 265 F.3d 1259, 1266 (Fed. Cir. 2001) (internal citations and quotation

marks omitted). However, "this requirement does not necessitate the identification of a statutory or regulatory provision by title or number, when the employee's statements and the circumstances surrounding the making of those statements clearly implicate an identifiable violation of law, rule, or regulation." Id.; see also Ayers v. Dep't of Army, No. DA-0752-12-0396-I-3, 2015 WL 6659683 (M.S.P.B. Nov. 2, 2015) (affirming Langer).

Plaintiff contends that he engaged in protected activity by emailing Berg and notifying him that, "JPL had unlawfully provided him with access to the MathCad files and that JPL was attempting to cover-up Plaintiff's use of the MathCad files." JMOL Opp'n at 15. However, the Court finds that this misstates the evidence because the evidence at trial does not permit a reasonable inference that plaintiff reasonably suspected illegal conduct, nor a violation of a regulation or rule. As a preliminary matter, plaintiff's email to Berg does not mention suspected illegality, nor would one conclude that plaintiff's allegations described unlawful conduct. To the contrary, plaintiff indicates that he used data which "may be Lockheed proprietary (most likely not)." See Berg Email. Similarly, at no point in plaintiff's testimony did he testify that he was reporting illegal or unlawful conduct. Plaintiff's use of the phrase "cover-up," in his reports to JPL Ethics and Congresswoman Chu, is plaintiff's most relevant claim. However, an allegation of a "cover-up" only discloses illegal conduct if the underlying conduct which is being concealed is itself illegal. The evidence does not support a finding that that was the case here.

Plaintiff's own actions, taken at the time of the incident, also do not support a conclusion that plaintiff believed that his use of the Lockheed Martin files was illegal. Plaintiff *requested* use of the files after the kick-off meeting where Facto stated that contractors were not authorized to access Lockheed Martin's proprietary information. Based on plaintiff's request, Brown and Fierheller searched for the files. Plaintiff also signed-off on the IOM the day after he sent the email to Berg in which plaintiff told Berg that he required resolution on the question of access before he could release the report.

The most that could be found about plaintiff's disclosures indicates that he believed that JPL had violated a contractual agreement with Lockheed Martin. However, the Court is aware of no authority which supports the proposition that a breach of contract could constitute a "violation of a law, rule, or regulation," as contemplated by the DCWPA, and "expressions of concern that do not raise the reasonable prospect of" one of these enumerated circumstances "do not constitute 'protected activity,'" as

contemplated by the DCWPA. <u>Cody</u>, 207 F. Supp. 3d at 622. In addition, because this is a situation where the "circumstances surrounding" plaintiff's disclosures do not "clearly implicate an identifiable violation of law, rule, or regulation," plaintiff was required to identify one. <u>Langer</u>, 265 F.3d at 1266. He did not.[13] Plaintiff's assertion, in his email to Berg, that he had "heard that such Lockheed proprietary documents as provided by Lockheed in fulfillment to the InSight project are forbidden to contractors, (hearsay)," does not satisfy that requirement.

In sum, the record evidence, viewed in the light most favorable to plaintiff, fails to demonstrate that plaintiff had a "reasonable belief" that he disclosed information which demonstrated "gross mismanagement," "a gross waste of . . . funds," "an abuse of authority," "a violation of law, rule, or regulation" or "a substantial and specific danger to public health or safety," in relation to Department of Defense or NASA contracts or grants. 10 U.S.C.A. § 2409(a)(1) (West). Plaintiff never testified that he believed federal funds may be lost as a result of Brown's actions, nor that there was a threat to public health or safety; he did not testify that he perceived an abuse of authority; he never presented evidence that he believed the alleged misconduct "create[d] a substantial risk of significant adverse impact on the agency's ability to accomplish its mission;" and he never testified that he was reporting unlawful activity. The Court thus finds that plaintiff's disclosures were not, as a matter of law, a protected activity within the meaning of Section 2409(a).

### b.    Whether Defendant had notice of Plaintiff's Protected Activity

Notwithstanding the fact that plaintiff failed to present evidence, at trial, which indicated that plaintiff reasonably believed that he was reporting illegal activity, plaintiff argues that "[t]here was sufficient evidence for the jury to infer that plaintiff had reasonable cause to believe that the information he was reporting was violation [sic] of state of [sic] federal statute, in this case fraud, theft, and violating Lockheed Martin's

---

[13]    When defendant filed its motion for summary judgment, plaintiff filed a supplemental memorandum in which plaintiff argued that he had a "reasonable cause to believe" that JPL's conduct might have violated California Civil Code §§ 1709, 1710 fraudulent deceit; California Civil Code § 3426 Uniform Trade Secrets Act; or California Penal Code § 487. Dkt. 58. However, plaintiff did not pursue any of these claims at trial, nor identify any of these statutes during trial. He also did not explain how his access to the MathCad files could reasonably constitute a violation of these statutes.

intellectual property rights." JMOL Opp'n at 7. The Court disagrees, as discussed above. However, even assuming that plaintiff engaged in protected activity, the Court finds that the evidence presented at trial was not legally sufficient to support a finding that defendant "knew or was reasonably on notice" that plaintiff engaged in protected activity. Cody, 207 F. Supp. 3d at 620–21.

To determine whether an employee had notice that an employee engaged in protected activity under the DCWPA, courts consider

> whether the employee has used language that, under the relevant circumstances and within the specific context in which the communications were made, puts an employer on reasonable notice that the employee is bringing to its attention conduct that qualifies as "protected activity" under . . . the DCWPA; in other words, language sufficient to let an employer know that its whistleblower employee is actually blowing a whistle.

Id., at 621–22. As discussed above, the only disclosure that could have provided notice to defendant of anything amiss was plaintiff's email to Berg, dated October 8, 2014. Defendant was not alerted to either plaintiff's reports to JPL Ethics or to Congresswoman Chu's office at the time plaintiff was terminated. See Section III(B)(1)(b). However, assuming, arguendo, that plaintiff's email to Berg constituted a protected disclosure, in these circumstances, the Court finds no basis by which a reasonable jury could conclude that defendant had actual or constructive notice that plaintiff engaged in protected activity before he was terminated. Furthermore, plaintiff's email expressly stated that the MathCad files were "most likely not" proprietary, and he highlighted the point that the files themselves where "NOT marked" as proprietary. See Berg Email; Tr. 2/19/19, 88:18–22; 89:25–90:3. Plaintiff's discussion of his conversations with Chau also do not "clearly implicate" unlawful behavior. Langer, 265 F.3d at 1266. In addition, plaintiff told Berg that he required resolution of the issue before he could sign the IOM. Id. The very next day, however, plaintiff signed the IOM. Accordingly, even if plaintiff's email raised suspicions, plaintiff's signature indicated that he believed the issue had been resolved, at least in his own mind, only one day later. Berg's testimony further makes unreasonable a finding that defendant had actual notice. He testified that he did not interpret plaintiff's email to be reporting fraud or illegal activity.

Thus, in light of the nature of the conduct that plaintiff reported, the language that plaintiff used to report the suspected misconduct, the fact that plaintiff signed the IOM

CIVIL MINUTES – GENERAL          'O'

| Case No. | 2:17-cv-02538-CAS-SSx | Date | July 26, 2019 |
|----------|------------------------|------|---------------|
| Title | DAVID LILLIE v. MANTECH INT'L. CORP. ET AL. | | |

only one day after he sent his email to Berg, and Berg's testimony, the Court concludes that there was no basis for a reasonable jury to find that defendant was actually or constructively on notice that plaintiff engaged in protected activity. The Court thus **GRANTS** judgment as a matter of law in favor of defendant, as to plaintiff's claim under the DCWPA.[14]

### 3.     Plaintiff's Claim Under California Labor Code § 1102.5

California's Labor Code Section 1102.5(b) provides, in relevant part, that

[a]n employer . . . shall not retaliate against an employee for disclosing information . . . to a government or law enforcement agency [or] to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance . . . if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

Cal. Lab. Code § 1102.5(b). To establish a prima facie case of retaliation under Section 1102.5(b), a plaintiff must show that: (1) he engaged in protected activity; (2) his employer thereafter subjected him to an adverse employment action; and (3) a causal link between the two. Soukup v. Law Offices of Herbert Hafif, 39 Cal. 4th 260, 287–88 (2006) (citing Morgan v. Regents of Univ. of Cal., 88 Cal. App. 4th 52, 69 (2000)).

Protected activity "requires the disclosure of a state or federal violation," but "a plaintiff [is] not required to prove an actual violation as long he reported his 'reasonably based suspicions' of the illegal activity." Love v. Motion Indus., Inc., 309 F. Supp. 2d 1128, 1135 (N.D. Cal. 2004) (quoting Green v. Ralee Engineering, 19 Cal. 4th 66, 87 (1998)); see also Patten v. Grant Joint Union High Sch. Dist., 134 Cal. App. 4th 1378, 1385 (2005) (explaining that the disclosure of "internal personnel matters" does not constitute protected activity under § 1102.5, which requires disclosure of a legal

---

[14]     While the Court recognizes that the third element, i.e. causation, is a question of fact, which the jury decided in favor of plaintiff, the Court need not address that factor in light of its finding that there was no protected activity. Even if defendant terminated plaintiff because of his email to Berg, this conduct would not be unlawful, under the DCWPA, because plaintiff did not engage in protected activity, as contemplated by § 2409.

violation).  "The causal link may be established by an inference derived from circumstantial evidence, such as the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected action and allegedly retaliatory employment decision."  Morgan, 88 Cal. App. 4th at 69–70 (citations omitted).  "Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity."  Id. at 70, 74 ("Here, each of the individuals who decided not to hire appellant for a particular position disclaimed knowledge of the fact that appellant had previously filed a grievance against the University.  Without such knowledge, these individuals could not have acted in retaliation for appellant's filing of the grievance.").  Under § 1102.5, plaintiff's protected activity need only be a contributing factor in defendant's adverse employment decision.

Defendant argues that "plaintiff cannot establish that he engaged in protected activity as he made no disclosure regarding an alleged violation of state or federal law."  JMOL Mot. at 27 (citing Prem v. Access Servs., Inc., No. CV 11-01358 ODW JEMX, 2011 WL 1519243, at *3 (C.D. Cal. Apr. 20, 2011)) ("[T]o state a claim [under § 1102.5, plaintiff must be able to identify a specific state or federal statute, rule, or regulation which he believed defendants were violating.").  The Court notes, however, that other courts have not required a plaintiff to specifically identify a state or federal statute, where they had a reasonable belief that the conduct they reported was unlawful.  See, e.g., Dowell v. Contra Costa Cty., 928 F. Supp. 2d 1137, 1155 (N.D. Cal. 2013) ("[E]ven if plaintiff did not allege the exact state law she believe Defendants violated, the language of the statute—requiring that Plaintiff disclose what she has reasonable cause to believe is a violation of a state or federal statute—shows that Plaintiff's allegations suffice in this regard.").

Even if plaintiff were not required to identify the specific state or federal violation in question, the Court finds that it must grant judgment as a matter of law on plaintiff's § 1102.5 claim for two reasons.  First, plaintiff failed to present evidence that he "reasonably believed" that he was disclosing illegal activity.  See Section III(B)(2)(a)(iv).  His speculation that Brown was concealing the fact that JPL might have violated a contract with Lockheed Martin simply does not constitute "'reasonably based suspicions' of the illegal activity."  Love, 309 F. Supp. 2d at 1135.  Instead, in light of the fact that plaintiff presented no evidence that he had a reason to suspect that Brown's conduct was illegal, plaintiff's disclosure presented nothing more than "internal personnel matters," which do not constitute protected activity under § 1102.5.  Patten, 134 Cal. App. 4th at 1384–85 (concluding that a teacher's disclosures of colleagues' alleged misconduct

constituted "internal personnel matters," which did not constitute protected disclosures). As the California Court of Appeal has explained, §1102.5 does not protect disclosures of internal personnel matters because "[t]o exalt these exclusively internal personnel disclosures with whistleblower status would create all sorts of mischief. Most damagingly, it would thrust the judiciary into micromanaging employment practices and create a legion of undeserving protected 'whistleblowers' arising from the routine workings and communications of the job site." Id. at 1385.

Defendant's awareness of plaintiff's protected activity is also required under § 1102.5, see Morgan, 88 Cal. App. 4th at 69–70, and as the Court has already concluded, there is no evidence that defendant had actual or constructive notice that plaintiff suspected illegal activity. See Section III(B)(2)(b). The way in which plaintiff contacted Berg, the message he conveyed, and plaintiff's own actions, bar a reasonable jury from finding that defendant understood—or even should have understood—that plaintiff's email to Berg plaintiff constituted protected activity.

For these reasons, the Court **GRANTS** judgement as a matter of law in favor of defendant as to plaintiff's claim under § 1102.5.

\* \* \* \* \*

In sum, the Court **GRANTS**, in favor of defendant, judgment as a matter of law on all three of plaintiff's claims. The Court recognizes that on September 24, 2018 it denied summary judgment on this claims. Dkt. 80. However, the Court noted, at the hearing on defendant's motion for summary judgment, that these issues would be better decided on a motion brought under Rule 50, once the record was complete. Now, viewing all the evidence in the light most favorable to plaintiff, the Court finds that the evidentiary record does not permit a reasonable jury to conclude that defendant retaliated against plaintiff, as contemplated by the FCA, the DCWPA, or California Labor Code Section 1102.5.

### 4.     Conditional Ruling on a Motion for New Trial

"If the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed. The court must state the grounds for conditionally granting or denying the motion for a new trial." Fed. R. Civ. P. 50(c)(1). "A motion for a new trial may be granted on this ground only if the verdict is

**CIVIL MINUTES – GENERAL**    **'O'**

| Case No. | 2:17-cv-02538-CAS-SSx | Date | July 26, 2019 |
|---|---|---|---|
| Title | DAVID LILLIE v. MANTECH INT'L. CORP. ET AL. | | |

against the 'great weight' of the evidence or 'it is quite clear that the jury has reached a seriously erroneous result.'" Venegas v. Wagner, 831 F.2d 1514, 1519 (9th Cir. 1987) (quoting Digidyne Corp. v. Data General Corp., 734 F.2d 1336, 1347 (9th Cir. 1984)).

In the event that the Court of Appeals were to find that judgment as a matter of law is not appropriate in this case, the Court conditionally grants a new trial because the jury's verdict—with regard to both the merits and damages—are contrary to the "great weight" of the evidence. First, as discussed above, even if plaintiff engaged in protected activity, as contemplated by the FCA, the DCWPA, or California Labor Code § 1102.5, the evidence at trial does not support a finding that defendant had notice of this protected activity. The parties agree that plaintiff's email to Berg, dated October 8, 2014, was the only notice of wrongful activity given to defendant, and the weight of the evidence does not support a conclusion that this email would give a reasonable person notice that the author was reporting fraudulent or unlawful activity. Berg also testified that he did not interpret the email as one reporting illegal or fraudulent activity.

The clear weight of the evidence also does not support the jury's findings on causation. The record is undisputed that before plaintiff was rehired by defendant in 2014, plaintiff had been twice previously hired and terminated by defendant, from 2007 through 2012, due to changes in funding. See Section II(A). He was also repeatedly furloughed during this time. Id. Defendant presented evidence that its policy was to furlough, or terminate employees, in accordance with the work that was available. Stip. Fact. Nos. 10, 19; Tr. 2/20/19 P.M., 24:22–25:2; 29:13-30:4. The weight of the evidence supports a conclusion that the decision to furlough and terminate plaintiff in Fall and Winter of 2014 – 2015 resulted from the same funding issues, in conjunction with plaintiff's own choices. For example, defendants presented multiple emails from JPL group leads to defendant, which indicated that they had no more work for plaintiff in the fall and winter of 2014. In particular, it is undisputed that on January 21, 2015, Klohoker sent an email to Berg stating:

> I do not have full-time work for David Lillie. I am, and have been in the past, satisfied with the quality and quantity of David's work. Because of that, I would like for you to retain David's services in a consultation or an on-call status if that would be something that ManTech and David would be amenable to.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:17-cv-02538-CAS-SSx | Date | July 26, 2019 |
| Title | DAVID LILLIE v. MANTECH INT'L. CORP. ET AL. | | |

Dkt. 188-10, Plaintiff's Ex. 18. Klohoker testified that no one asked him to send Berg that email. Tr. 2/21/19 A.M., 69:12–14. Plaintiff rejected this offer when Berg extended it to him, which led to his termination.

Similarly, on December 19, 2014, Berg sent plaintiff an email notifying him of another furlough because defendant "received a stop work on the tasking you are currently working with JPL." Stip. Fact No. 39. Plaintiff responded not by suggesting that he was being unlawfully retaliated against, but by stating,

> Once again, I remind you that I am a full-time employee. You can offer me a furlough but I can say no. This is the case. No. If you don't have work for me, it's a Mantech problem not mine. I decline to accept anything other than full-time employment. I DO NOT agree to this change in my employment. I DO NOT agree to accept this furlough offer. The answer is no. Mantech likely should lay me off if there is not a full-time position for me. However if I am laid-off, Mantech is to cease using my professional credentials (i.e. resume) or good name to pursue Mantech's ambitions. This includes any proposal for present or future business. This is written notice, I DO NOT agree to this change in my employment, (furlough).

Stip. Fact No. 40 (emphasis in the original); see also Stip. Fact Nos. 34–36. Accordingly, the clear weight of the evidence indicates that defendant furloughed plaintiff in accordance with the work which was available, and that plaintiff declined to remain employed by defendant under the terms of his contract. Defendant therefore terminated him.

The clear weight of the evidence is also contrary to the jury's damages determination. The jury awarded plaintiff (1) $521,983.00 for past lost earnings, (2) $339,828.00 for future lost earnings, (3) $321,875.00 for past emotional distress, and (4) $321,875.00 for future emotional distress. This totaled $1,505,561.00. The parties agreed that throughout plaintiff's final period of employment, his annual salary was $113,276.80. Stip. Fact No. 22. Thus, in reaching this damages award, the jury effectively found that, if not for his termination, plaintiff would have remained employed by defendant until 2022—roughly seven and a half years after plaintiff was terminated.

However, plaintiff had never previously worked for defendant for a seven-year period, and here, the clear weight of the evidence demonstrated that plaintiff's

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:17-cv-02538-CAS-SSx | Date | July 26, 2019 |
| Title | DAVID LILLIE v. MANTECH INT'L. CORP. ET AL. | | |

employment would have terminated much sooner—at one of two possible junctures. First, the evidence strongly indicates that plaintiff would have been terminated in April 2015, when defendant learned that plaintiff violated his employment contract by taking confidential and proprietary data. More specifically, defendant changed plaintiff's employment status after it learned, from JPL, that plaintiff took JPL's confidential data in violation of his confidentiality agreement with defendant. Tr. 2/21/19 P.M., 43:17–24; 60:15–24; 64:13–65:11; Tr. 2/22/19, 30:18–23. Plaintiff admitted that he copied and retained JPL's property until April 13, 2015. Tr. 2/20/19 A.M., 26:3–16; 33:6–34:19. Accordingly, the evidence offered at trial supports a conclusion that plaintiff would have been terminated in April 2015, which would have resulted in no award for front pay, back for only three months—roughly $28,319.20—and a total damages award of $672,069.20.

Alternatively, even if plaintiff had not been terminated in April 2015, the clear weight of the evidence demonstrates that his position would have been terminated in December 2016, when the RESS contract, under which defendant hired plaintiff, expired. At that time, JPL declined to renew the RESS contract with defendant; instead, it awarded the work to another contracting group. Tr. 2/21/19 P.M., 61:5–8; Tr. 2/20/19 P.M., 67:7–68:1. Although plaintiff argues that defendant is a large company, with other ongoing projects, plaintiff failed to produce evidence that he would have been hired on these other projects. Accordingly, plaintiff's employment would have ended in December 2016, which would have resulted in no award for front pay, back for only twenty-three months—roughly $217,113.87—and a total damages award of $860,863.87.

In sum, the clear weight of the evidence fails to support the jury's damages award of $1,505,561.00, and, as discussed above, it does not support the jury's findings of liability on the merits. Therefore, in light of the evidence presented regarding defendant's notice of plaintiff's allegedly protected activity, causation, and plaintiff's damages, "it is quite clear that the jury has reached a seriously erroneous result." Venegas, 831 F.2d at 1519. The Court therefore conditionally **GRANTS** a new trial in the event that its judgment as a matter of law is reversed.

## IV.  PLAINTIFF'S MOTION FOR TWO TIMES BACK PAY UNDER THE FALSE CLAIMS ACT

On May 6, 2019, plaintiff filed a motion for two times back pay, pursuant to the FCA. Dkt. 186; see 31 U.S.C.A. § 3730 (West) (providing that relief, for a claim

| Case No. | 2:17-cv-02538-CAS-SSx | Date | July 26, 2019 |
|----------|------------------------|------|----------------|
| Title    | DAVID LILLIE v. MANTECH INT'L. CORP. ET AL. | | |

alleging retaliatory adverse employment action under the FCA, shall include, *inter alia*, 2 times the amount of back pay). Defendant opposed the motion on May 23, 2019, dkt. 189, and plaintiff filed a reply on June 3, 2019, dkt. 193.

In light of the Court's finding that judgment as a matter of law should be granted in favor of defendant, plaintiff's motion for two times back pay under the FCA is **DENIED** as moot.

## V.    PLAINTIFF'S MOTION FOR ATTORNEY'S FEES

Plaintiff also filed a motion for attorneys' fees on May 6, 2019. Dkt. 187 ("Fees Mot."). Defendant opposed the motion on May 23, 2019, dkt. 190, and plaintiff filed a modified reply on June 6, 2019, dkt. 198.

In light of the Court's finding that judgment as a matter of law should be granted in favor of defendant, plaintiff's motion for attorneys' fees is **DENIED** because plaintiff was not the prevailing party on any claim.

## VI.    CONCLUSION

In accordance with the foregoing, defendant's renewed motion for judgment as a matter of law is **GRANTED** as to plaintiff's claims under the FCA, the DCWPA, and § 1102.5. In the event that the Court of Appeals were to find that judgment as a matter of law is not appropriate in this case, the Court conditionally grants a new trial

Plaintiff's motion for two times back pay is **DENIED** as moot.

Plaintiff's motion for attorney's fees is **DENIED**.

IT IS SO ORDERED.

|  | 00 | : | 00 |
|--|----|----|----|
| Initials of Preparer | | CMJ | |